UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
                                    :       03 Civ. 6480 (SHS)
In re POLAROID CORPORATION        :       (and all consolidated cases)
SECURITIES LITIGATION             :       <u>OPINION & ORDER</u>
                                      :
--------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

       This dispute arises from the demise of the former instant photography giant,

Polaroid Corporation, whose fortunes fell when confronted by the advent of digital

photography. Lead plaintiffs, the Constance Sczesny Trust and the Edward R. Sczesny

Trust, who bring this consolidated action on behalf of a proposed class of individuals

who purchased Polaroid securities during the period March 28, 2000 through August 9,

2001, seek to recover losses they allegedly suffered due to what they characterize as

Polaroid's "accounting shenanigans" that were approved by its outside auditor, KPMG

LLP. In the Amended Consolidated Class Action Complaint, plaintiffs assert claims

pursuant to sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C.

§§ 78j(b) and 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder.

Defendants – KPMG and three former executives of the now defunct Polaroid

Corporation – have moved to dismiss the complaint. Because certain of plaintiffs' claims

are barred by the applicable statute of limitations, and because plaintiffs have failed to

plead scienter with the requisite particularity as to the remaining claims, defendants'

motion is granted.

TABLE OF CONTENTS

I.     FACTUAL BACKGROUND ..................................................................................... 2
     A.   Overview.......................................................................................................... 2
     B.   The Parties ....................................................................................................... 3

C.   The Alleged Fraud and its Aftermath ................................................................. 4
   i.   Deferred Tax Assets ..................................................................................... 4
   ii.   Reversal of Restructuring Reserves ........................................................... 6
   iii.   Failure to Issue Going Concern Qualification and Misrepresentations
   Regarding Refinancing ..................................................................................... 7
      a.   The 2000 Annual Report .......................................................................... 7
      b.   The Quarterly Report for the First Quarter of 2001 ................................ 10
      c.   Polaroid's Demise and the Current Litigation ....................................... 11
II.   DISCUSSION ..................................................................................................... 11
   A.   Legal Standard on Motion to Dismiss ............................................................. 11
   B.   Statute of Limitations ..................................................................................... 12
   i.   Deferred Tax Assets ..................................................................................... 15
   ii.   Reversal of Restructuring Reserve ............................................................. 17
   iii.   Failure to Issue Going Concern Qualification and Misrepresentations
   Regarding Refinancing ..................................................................................... 18
   C.   Scienter ......................................................................................................... 21
   i.   KPMG ......................................................................................................... 22
   ii.   Polaroid Executives ..................................................................................... 25
III.   CONCLUSION ................................................................................................. 29

I   FACTUAL BACKGROUND

   A.   Overview

    Polaroid had been the foremost instant photography company before competition
from digital photography significantly impacted its core business.  (Amended Compl. ¶
1.)  Polaroid ultimately found it necessary, in October 2001, to file for bankruptcy
protection.  (Id. ¶ 101.)   The bankruptcy court, acting pursuant to a request from former
shareholders, appointed a bankruptcy examiner – Perry M. Mandarino – to investigate
allegations that Polaroid had undervalued its assets and thus prematurely filed for Chapter
11.  (Id.)  The examiner issued his report in August 2003 (the "Mandarino Report"),
finding no basis for crediting those allegations.  Instead, the examiner reported that the
company's financial condition had been deteriorating more rapidly than had been
reflected in its public disclosure documents in the years immediately preceding the

bankruptcy filing.  (Id.)  That report's disclosure of allegedly inappropriate accounting entries at Polaroid spurred the allegations raised by plaintiffs in this litigation.

### B.  The Parties

Plaintiffs are a purported class of all persons who purchased Polaroid's publicly traded securities from March 28, 2000 through August 9, 2001 (the "Class Period") and were thereby allegedly damaged.  Id. ¶ 20.

Defendant KPMG is an international auditing firm with headquarters in New York.  Id. ¶ 14.  KPMG audited each of the Polaroid financial statements at issue in this litigation.  Id. ¶ 14.

Defendant Gary T. DiCamillo was Chairman and Chief Executive Officer of Polaroid during all periods relevant to this litigation, and signed Polaroid's 1999 and 2000 annual reports.  Id. ¶ 15.  Defendant Judith G. Boynton was the Executive Vice President and Chief Financial Officer of Polaroid through January 24, 2001, and signed Polaroid's 1999 annual report (the "1999 10-K") and its first three quarterly reports for the year 2000.  Id. ¶ 16.  She also allegedly prepared and approved Polaroid's earnings release issued on January 25, 2001, as well as its annual report for the year 2000 (the "2000 10-K").  Id.  Defendant Carl T. Leuders was Vice President and Chief Controller of Polaroid and, upon Boynton's resignation, was named Acting Chief Financial Officer. Id. ¶ 17.  He signed Polaroid's 1999 and 2000 10-Ks, and the quarterly report for the quarter ending April 2001 (the "1Q 2001 10-Q").  Id.

### C.  *The Alleged Fraud and its Aftermath*

Plaintiffs allege fraud by Polaroid executives and KPMG that can be broken down into the following three categories:

### i. *Deferred Tax Assets*

According to plaintiffs, a company may only include deferred tax assets on its books as income to the extent that they can be offset against future tax liabilities.  (Id. ¶ 32.)  As such, plaintiffs point out, Generally Accepted Accounting Principles ("GAAP") provide that deferred tax assets must be reduced by a valuation allowance "if, based on the weight of available evidence, it is more likely than not that some portion or all of the deferred taxes will not be realized."  (Id.; Statement of Fin. Accounting Standards ("SFAS") No. 109 (Fin. Accounting Standards Bd. 1988).)  If there is "negative evidence such as cumulative losses in recent years," "forming a conclusion that a valuation allowance is not needed is difficult."  (Id.)  Plaintiffs assert that Polaroid ignored these dictates and intentionally misrepresented the amount of deferred tax assets in several of its financial statements.

Specifically, plaintiffs assert that Polaroid's 1999 annual report, signed by each of the individual defendants, wrongly reported net deferred tax assets of $330.4 million, with loss and credit carry-forwards comprising more than $202 million of those assets. (Compl. ¶ 31.)  Polaroid did not take a valuation allowance, claiming in the report that "sufficient book and taxable income" would be generated to offset the entirety of its deferred tax assets.  (Id. ¶ 39.)  However, it had reported cumulative losses for the four years prior totaling $387.6 million.  (Id. ¶ 34.)  Plaintiffs assert that pursuant to GAAP, these losses alone militated in favor of a valuation allowance.  (Id.; SFAS No. 109)  They

also contend that, given Polaroid's recent history of failing to utilize its deferred tax assets, "there was no sound basis to support a conclusion that" Polaroid would be able to offset the $202 million in deferred tax assets it reported.  (Id. ¶ 44.)

Plaintiffs claim that KPMG fraudulently gave this deficient 10-K an unqualified audit opinion, despite being "well aware" of the evidence showing that a valuation allowance was necessary.  (Id. ¶¶ 35.)  KPMG was well aware of Polaroid's recent history of planning for profits but instead recording losses, plaintiffs allege, and even documented in 1999 its finding that two of the five factors that call for valuation allowances existed as to Polaroid: "cumulative losses in recent years" and "a history of operating loss or tax credit carry forwards expiring unused."  (Id. ¶¶ 35, 39, 91.)  Instead of performing a substantive assessment of the likelihood of utilizing its deferred tax assets, plaintiffs claim, KPMG – in violation of Generally Accepted Auditing Standards ("GAAS") – merely relied on an internal Polaroid memo suggesting that its cumulative loss problems were in the past and that it expected to be able to realize all of its deferred tax assets.  (Id. ¶¶ 37, 38; American Institute of Certified Public Accountants, Professional Standards AU § 333.)

Plaintiffs additionally claim that, as the company's bleak financial picture had not changed, the deferred tax asset figures in each of Polaroid's quarterly reports for the year 2000 were materially inflated due to the failure to take a valuation allowance.  (Compl. ¶¶ 46, 48, 50, 52.)  Plaintiffs also assert that the company's 2000 annual report included a fraudulent deferred tax asset figure of $327.7 million, including approximately $202 million of loss and credit carry-forwards.  (Id. ¶¶ 57, 65.)  The failure to take a valuation allowance by this point was particularly improper, plaintiffs assert, given that further

financial problems – including a $9.2 million pre-tax loss for the fourth quarter of 2000, and Polaroid's need to obtain temporary waivers of defaults on financial covenants contained in important short-term credit agreements – had allegedly accumulated.  (<u>Id.</u> ¶ 64).  An internal Polaroid memo at the time allegedly recognized as such.  (<u>Id.</u> ¶ 58.)  As with the prior statements, plaintiffs maintain that KPMG was aware of and ignored all of these red flags, instead providing an unqualified audit opinion based on the assurances of company executives alone.  (<u>Id.</u> ¶¶ 60-63, 74.)

Finally, plaintiffs allege that Polaroid's failure to record a valuation allowance for deferred tax assets in its quarterly report for the first quarter of 2001 – and KPMG's approval of that decision – was also fraudulent.  (<u>Id.</u> ¶¶ 90-91, 95-96.)

ii.      *Reversal of Restructuring Reserves*

In 2000, and again in 2001, Polaroid obtained waivers for defaults on certain financial covenants in its short-term credit agreements that required it to maintain key financial ratios, including debt to earnings before interest, taxes, depreciation and amortization ("EBITDA").   (<u>Id.</u> ¶ 66)  Defaulting on those agreements would have also triggered cross-default provisions in the company's long-term notes, risking an immediate call on its long-term debt.  (<u>Id.</u>)  Plaintiffs allege that, to avoid this parade of horribles, Polaroid executives in 2000 fraudulently reversed $5.8 million of restructuring charges relating mostly to accrued severance costs set up in 1997 and 1998.  (<u>Id.</u> ¶ 67.) Polaroid disclosed in its 2000 annual report that it had reversed a reserve that had been set up in 1997 and 1998.  <u>See</u> Polaroid Corp., Annual Report (Form 10-K), Supplemental Information/Restructuring and Other Charges (Apr. 2, 2001).  Polaroid had also noted in its 1998 annual report that it would continue to make payments out of the reserve through

the end of 2000.  <u>See</u> Polaroid Corp., Annual Report (Form 10-K), Supplemental

Information/Restructuring and Other Charges (Mar. 31, 1999).

Plaintiffs note that GAAP requires restructuring reserves to be utilized or reversed

within a year of their creation, although an extension of that time period can be warranted

given certain extenuating circumstances.  (<u>Id.</u> ¶ 69; SEC Staff Accounting Bulletin No.

100, 64 Fed. Reg. 67154.)  Because, according to plaintiffs, no such circumstances

existed in Polaroid's case, "Polaroid inappropriately waited to reverse the reserve until

such time that it needed additional income to conceal the fact that it was unable to

generate sufficient earnings to meet its financial covenants."  (Compl. ¶ 70.)  Plaintiffs

allege that carrying the reserve on its books past 1999 was improper; that the eventual

reversal resulted in a fraudulently stated earnings release on January 25, 2001; that both

DiCamillo and Leuders were aware of these improprieties; and that KPMG's clean

opinion on Polaroid's 2000 10-K was fraudulent because KPMG too was aware of the

reversal.  (<u>Id.</u> ¶¶ 55, 70, 71, 74.)

### iii.  Failure to Issue Going Concern Qualification and Misrepresentations Regarding Refinancing

### a.  The 2000 Annual Report

According to plaintiffs, KPMG ignored a mountain of evidence suggesting

impending insolvency at Polaroid prior to its audit of the 2000 annual report, causing it to

fraudulently refrain from issuing a going concern qualification.  Plaintiffs point out that

an auditor has a duty to "evaluate whether there is substantial doubt about the entity's

ability to continue as a going concern for a reasonable period of time, not to exceed one

year beyond the date of the financial statements being audited."  (<u>Id.</u> ¶ 75; <u>Codification of

Accounting Standards and Procedures</u>, Statement on Auditing Standards No. 59, § 341

(Am. Inst. of Certified Pub. Accountants)).  In the event the auditor concludes that the company will not be able to continue as a going concern, it must express this conclusion in its audit report.  (Id.)  Plaintiffs argue that Polaroid's decision not to issue such a qualification in connection with the 2000 annual report was reckless given the array of misfortunes that had befallen the company by that time, including the increasing success of digital photography competitors; the fact that the alleged deferred tax asset and reserve reversal frauds were helping keep Polaroid afloat; and the fact that Polaroid had defaulted on financial covenants in certain credit agreements and was unsure if it would be able to extend the existing waivers on those defaults for much longer.  (Compl. ¶¶ 76, 84-85.)

The complaint alleges that, faced with this evidence, KPMG considered issuing a going concern qualification and that "[i]n determining whether to issue a going concern qualification, KPMG was primarily focused on Polaroid's ability to obtain [re]financing" of its short term debt.  (Compl. ¶ 77.)  In satisfying itself that Polaroid could refinance, KPMG allegedly consulted with Dresden, Kleinwert Wasserstein ("DKW"), the investment banking firm Polaroid had hired to assist with refinancing efforts.  (Id. ¶¶ 76, 81.)  Although an internal KPMG memorandum indicates that DKW, in speaking with KPMG, "assigned a 90%+ probability that the [refinancing] negotiations would be successful," a DKW analyst later testified that he did not recall using the "90 percent" indicator.  (Id. ¶ 81.)  Whatever the substance of the conversation with DKW, however, plaintiffs argue that KPMG's sole reliance on the bankers' unsubstantiated report demonstrates at best a reckless approach towards the going concern question.

Plaintiffs also argue that this approach violated GAAS: KPMG's decision that Polaroid would continue as a going concern depended on how certain debt obligations were classified, which in turn depended on Polaroid's prospects for refinancing.[1] The bankruptcy examiner found that Polaroid's debt classifications, based as they were in part upon KPMG's discussions with DKW regarding refinancing, were improper because KPMG did not possess documentation confirming a forthcoming refinancing such as a consummated refinancing agreement.  (Mandarino Report at 61; SFAS No. 6 (Fin. Accounting Standards Bd. 1975)).

Plaintiffs similarly contend that since no such documentation existed, KPMG could not believe it was likely that Polaroid would refinance and stave off its troubles. They allege that although DKW had sought out and received refinancing bids by the time the 2000 10-K was filed, KPMG knew that no commitment had been obtained and no prospective lender had performed due diligence by that time.  (Id. ¶¶ 76, 83.)  This indicated "a lack of interest by the lenders" that "clearly undermined" DKW's assertion that refinancing was likely.  (Id. ¶ 83.)  Having performed an insufficient investigation into Polaroid's prospects for refinancing, and equipped with much evidence suggesting that without such refinancing insolvency was likely, plaintiffs contend, KPMG's decision not to issue a going concern qualification was reckless.

---

[1] Despite noting its importance, plaintiffs do not spell out the precise connection between the refinancing efforts and KPMG's decision not to issue a going concern qualification.   The Bankruptcy Examiner's Report appears to explain that connection as follows:  In early 2001 Polaroid had defaulted on certain short-term debt agreements, triggering cross-defaults on its notes.  (Mandarino Report, at 57.)  Even though the former defaults had been temporarily waived, the cross-defaults meant that both "the [short-term agreements] and Notes . . . could have become callable during 2001."  Therefore, "it would have been more meaningful and credible to have classified the Notes as current at December 31, 2000."  Additionally, "the classification of the Notes as current at December 31, 2000 . . . would likely have resulted in the issuance of a going concern qualification."  (Id. at 60-61).  But, according to the bankruptcy examiner, because KPMG believed that Polaroid would refinance the short-term debt and stave off its troubles, including with regard to the cross-defaulted notes, it did not issue a going concern qualification.  (Id. at 61.)

### b.   The Quarterly Report for the First Quarter of 2001

Plaintiffs assert that KPMG similarly fraudulently failed to include a going concern qualification in the quarterly report for the first quarter of 2001 despite Polaroid's increasingly precarious financial situation.  (Id. ¶ 96.)  Plaintiffs also claim that the report itself – signed by defendant Leuders – contained fraudulent statements with respect to Polaroid's survival prospects.  In particular, Polaroid represented that:

> [Polaroid] is currently involved in negotiations with certain financial institutions with respect to refinancing the Amended Credit Agreement, the U.K. Credit Agreement, and, if necessary, the 2002 Notes and has retained a financial advisor to assist it with these matters. . . Based on the status of its negotiations, the Company *expects* to complete the refinancing of the Amended Credit Agreement, the U.K. Credit Agreement and, if necessary, the 2002 Notes in the second half of 2001.

(Compl. ¶ 92 (emphasis in complaint).)  Plaintiffs assert that, unbeknownst to investors, Polaroid had "no basis" upon which it could fairly claim that it expected to complete the refinancing of the short-term debt.  (Compl. ¶ 93.)  According to plaintiffs, no lenders had expressed a willingness to refinance Polaroid's debt at the time the quarterly report was filed.  (Id. ¶ 93.)  They point to a DKW memo dated May 16, 2001 – the same day the 10-Q was filed – recommending chapter 11 bankruptcy.  (Id.)

Though no financing commitment was in fact ever obtained, the Bankruptcy Examiner's Report indicates that some progress was being made on the refinancing front in the months leading up to the filing of the quarterly statement.  For example, at least two prospective lenders delivered presentation materials to Polaroid in March 2001; Citibank specified April 9, 2001 as the "target date" to deliver its financing commitment; and potential lenders began conducting due diligence in April.  (Mandarino Report, at 48.)

### c.  Polaroid's Demise and the Current Litigation

Plaintiffs allege that "the truth about Polaroid's financial situation was partially disclosed" on July 15, 2001, when the company failed to make interest payments owed on certain of its notes.  (Compl. ¶ 98.)  The failure to make these payments constituted a default, which if not cured within 30 days would give the lenders the right to accelerate the maturity of the principal and all past due interest.  (Mandarino Report, at 55.) Polaroid did not make the payments because further default waivers on its short-term credit agreements had been conditioned on non-payment of interest on its long-term notes.  (Id.)

On August 9, 2001, the "full truth" about Polaroid's financial condition was allegedly disclosed when Polaroid's quarterly report for the second quarter of 2001 included a going concern qualification from KPMG.  (Compl. ¶ 99.) Just two months later, on October 12, 2001, Polaroid filed for Chapter 11.  (Id. ¶ 101.)  Plaintiffs instituted this lawsuit in August 2003.  Defendants have moved to dismiss the Amended Complaint on the grounds that (i) plaintiff's claims are barred by the statute of limitations; (ii) plaintiffs have failed to plead scienter with particularity; and (iii) plaintiffs have failed to plead causation.

## II.  DISCUSSION

### A.  Legal Standard on Motion to Dismiss

On a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court may dismiss a claim only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle [it] to relief."  Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S.

Ct. 99 (1957); Drake v. Delta Air Lines, Inc., 147 F.3d 169, 171 (2d Cir. 1998).  In

deciding the motion, the court must treat all factual allegations as true, and must draw all

reasonable inferences in plaintiffs' favor.  Ganino v. Citizens Utilities Co., 228 F.3d 154,

161 (2d Cir. 2000).  The court's review is limited to the allegations in the complaint and

"any written instrument attached to it as an exhibit or any statements or documents

incorporated in it by reference, as well as public disclosure documents required by law to

be, and that have been filed with the SEC. . . ."  Rothman v. Gregor, 220 F.3d 81, 88-89

(2d Cir. 2000); Lentell v. Merrill Lynch & Co., 396 F.3d 161, 165 (2d Cir. 2005), cert.

denied, 126 S. Ct. 421, 163 L.E.2d 321 (Oct. 11, 2005).  "'[W]hen a plaintiff chooses not

to attach to the complaint or incorporate by reference a document upon which it relies

and which is integral to the complaint,' the court may nevertheless take the document

into consideration in deciding the defendant[s'] motion to dismiss, without converting the

proceeding to one for summary judgment."  Int'l Audiotext Network, Inc. v. AT & T Co.,

62 F.3d 69, 72 (2d Cir.1995) (quoting Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d

42, 47-48 (2d Cir. 1991)).  Polaroid's financial statements and the Bankruptcy

Examiner's Report are "integral to the complaint" and are very heavily relied upon by

plaintiffs in their complaint and by all parties in their motion papers.  Accordingly, the

Court has considered those documents for the purposes of this motion.

### B.  Statute of Limitations

As a threshold contention, KPMG asserts that plaintiffs' claims are time-barred.

At the time the allegedly misleading statements were made, private causes of action

pursuant to Section 10(b) and Rule 10b-5 had to be filed within one year from the

discovery of the violation.  See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,

501 U.S. 350, 364, 111 S. Ct. 2773, 115 L. Ed. 2d 231 (1991).  The Sarbanes-Oxley Act,

passed on July 30, 2002, extended that period to two years as to any cause of action that

was within the previously governing one year limitation.  See 28 U.S.C. § 1658(b).  Any

section 10(b) or Rule 10b-5 claim that was "live" – i.e., within its first year – on this date

had its limitations period extended to two years from the date of discovery or five years

from the violation.  28 U.S.C. § 1658(b)[A](1)-(2).  The question whether the present

action was timely filed therefore depends in part on whether the cause of action was live

when Sarbanes-Oxley was enacted.  See In re ProNetLink Sec. Litig., 403 F. Supp. 2d

330, 333 (S.D.N.Y. 2005).

 The statute of limitations for a securities fraud claim begins to run once the

plaintiff either "obtains actual knowledge of facts giving rise to the action or notice of the

facts, which in the exercise of reasonable diligence, would have led to actual knowledge."

LC Capital Partners v. Frontier Ins. Group, Inc., 318 F.3d 148, 154 (2d Cir. 2003)

(quoting Kahn v. Kohlberg, Kravis, Roberts & Co., 970 F.2d 1030, 1042 (2d Cir. 1992))

(internal quotation marks omitted).  A plaintiff will be deemed to have inquiry notice

when there are "storm warnings," i.e., "when the circumstances would suggest to an

investor of ordinary intelligence the probability that she has been defrauded."  LC

Capital, 318 F.3d at 154 (citing Dodds v. Cigna Sec., Inc., 12 F.3d 346, 350 (2d Cir.

1993)).  To determine that a duty to inquire has arisen, a court must find that the

existence of fraud is "a probability, not a possibility."  Newman v. Warnaco Group, Inc.,

335 F.3d 187, 194 (2d Cir. 2003); see also Lentell, 396 F.3d at 168.  Importantly, the

"storm warnings" must relate directly to the alleged fraud.  See id. (citing Newman, 335

F.3d at 193).

Defendants claim that plaintiffs were on inquiry notice of all of the alleged frauds by August 9, 2001, when Polaroid's quarterly report for the second quarter was filed and KPMG issued a going concern qualification and when, by plaintiffs' own admission, the "full truth" about Polaroid was exposed.  Once it was clear that Polaroid's finances were in shambles, defendants contend, plaintiffs were on inquiry notice regarding potential frauds in financial statements from the recent past.  Moreover, defendants claim that plaintiffs were on inquiry notice for several months before August 9 given the "explicit" and "persistent" publicly disclosed facts about Polaroid's financial condition.

However, because the storm warnings must be "directly" related to the alleged fraud, see Lentell, 396 F.3d at 168, publicized financial pitfalls, on their own, are insufficient to put a reasonable investor on inquiry notice.  See Siebert v. Nives, 871 F. Supp. 110, 114 (D. Conn. 1994) ("It surely cannot be the case that every annual report which records corporate losses signals some underlying fraud.").  Instead, whether financial woes are sufficient to put an investor on inquiry notice depends on the nexus between those woes and the alleged fraud.

For example, in Phillips v. Kidder, Peabody & Co., 933 F. Supp. 303 (S.D.N.Y. 1996), aff'd mem. 108 F.3d 1370 (2d Cir. 1997), the defendants did not meet their predicted financial position for a given quarter because of, inter alia, allegedly fraudulent inventory write-offs.  Id. at 308.  A financial statement indicating substantial losses for that quarter, with little reference to inventory problems, was insufficient to prompt an inquiry into the inventory-based fraud.  Id. at 313-14.  Conversely, where the very fraud involves a misrepresentations as to the company's financial position more generally, significant financial problems concurrent with fraudulent assurances of success should

14

place a reasonable investor on inquiry notice.  See, e.g., In re Salomon Analyst Winstar Litigation, 373 F. Supp. 2d 241, 245 (S.D.N.Y. 2005) (where "the core of plaintiff's fraud claim is that defendants failed to disclose, irrationally minimized, or outright denied with no reasonable basis in fact, [the company's] 'precarious financial condition,'" company's publicized debt problems provided storm warnings).  As such, whether Polaroid's financial misfortunes constitute storm warnings depend on the nexus between those misfortunes and the particular frauds alleged.

  i.  *Deferred Tax Assets*

  Because the decision whether or not to take a valuation allowance for deferred tax assets is dependent on a company's prospects for profitability, it is true that a company's financial struggles are directly related to that decision.  However, that Polaroid in retrospect made insufficient profits to enable it to utilize its deferred tax assets is equally consistent with over-optimistic forecasting as it is with fraudulent forecasting.  Given the myriad non-fraudulent reasons that could cause a company to miss its forecasts, the failure to meet a projected goal typically does not suggest that the forecast itself was the product of fraud.  See Nivram Corp. v. Harcourt Brace Jovanovich, Inc., 840 F. Supp. 243, 253 (S.D.N.Y. 1993); Boley v. Pineloch Associates, Ltd., No. 87 Civ. 5124, 1990 U.S. Dist. LEXIS 9912, at *12-14 (S.D.N.Y. Aug. 2, 1990).  Accordingly, Polaroid's financial collapse in the summer of 2001, including its failure to reap profits, did not provide notice that its earlier failures to take valuation allowances were fraudulent.

  However, as plaintiffs point out, Polaroid was struggling financially not only in the time period immediately following its failures to take valuation allowances, but was also struggling concurrent with those failures.  In particular, plaintiffs claim that "forming

a conclusion that a valuation allowance is not needed is difficult when there is negative evidence such as cumulative losses in recent years" and that "Polaroid's cumulative losses before taxes for the years 1995-99 totaled $387.6 million – the very factor that . . . militates against forming a conclusion that a valuation analysis is not needed."  (Compl. ¶¶ 33-34.)  If the alleged fraud involves Polaroid's intentional ignorance of evidence strongly suggestive of the need to take a valuation allowance (and KPMG's approval of that decision), plaintiffs were on notice of that fraud as soon as the relevant statements were published because that evidence was publicly available in the statements of recent past.  See, e.g. Jackson National Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 702-03 (2d Cir. 1994) (financial information in prospectus indicating potential future debt troubles provided inquiry notice of fraud with respect to representations in same prospectus regarding ability to remain solvent).  Because Polaroid's recent cumulative losses "militate[] against forming a conclusion that a valuation allowance is not needed," plaintiffs were on inquiry notice that something was amiss as soon as that conclusion was formed and made public.[2]

The most recent financial statement that plaintiffs allege contained fraudulent representations regarding deferred tax assets was published on May 16, 2001, more than

---

[2] Plaintiffs assert that despite these public disclosures they could not have been on inquiry notice because they did not have access to "all available evidence" necessary to determine whether a valuation allowance was necessary, including whether Polaroid would be able to implement certain tax strategies to take advantage of all its deferred tax assets.  Inquiry notice, however, arises where the publicly available information is sufficiently suggestive of the probability of fraud that a reasonable investor would commence investigation.  In re Global Crossing, Ltd. Sec. Lit., 313 F. Supp. 2d 189, 202 (S.D.N.Y. 2003).  Investors need not be absolutely certain that fraud has been committed; rather, the concept of inquiry notice is hostile to the notion that the plaintiff be allowed "'leisurely discovery of the full details of the alleged scheme.'"  In re Integrated Resources Real Estate Limited P'ship Sec. Litig., 815 F. Supp. 620, 651 (S.D.N.Y. 1993) (citing Klein v. Bower, 421 F.2d 338, 343 (2d Cir. 1970)).  Here, while plaintiffs are correct that the available information did not establish with absolute certainty that Polaroid's failure to take a valuation allowance was fraudulent, that information – by plaintiffs' own admission – was on its own sufficiently suggestive of accounting abuses at Polaroid.

one year before the enactment of the Sarbanes-Oxley Act.  Plaintiffs' deferred tax asset claims were therefore not preserved by Sarbanes Oxley and are accordingly barred by the one-year statute of limitations.  See 28 U.S.C. § 1658(b)[A](1)-(2); In re ProNetlink Sec. Litig., 403 F. Supp. 2d at 333.

      ii.     *Reversal of Restructuring Reserve*

While defendants suggest no relational link that would cause Polaroid's more general financial collapse to imply fraud particular to Polaroid's restructuring reserves, once again information was available in Polaroid's own financial statements to give rise to inquiry notice.  The fraudulent act alleged is the reversal of a restructuring reserve three years after that reserve was set up – resulting in inflated earnings – despite accounting rules that required the reserve to be reversed within one year.  Since Polaroid announced in its 2000 10-K that it had reversed the reserve and that the reserve had been set up in 1997 and 1998, Polaroid fully disclosed to its investors the events comprising the allegedly fraudulent GAAP violation.  Cf. Jackson National Life Insurance, 32 F.3d at 701 (where alleged fraud was prospectus's false suggestion that a public offering would be conducted on an "all-or-none" basis, plaintiffs were on inquiry notice concurrent with prospectus's publication because the prospectus itself contained information that was inconsistent with an all-or-none offering).[3]

---

[3] Plaintiffs contend that because "special circumstances" can allow a reserve reversal to occur outside of the one-year time period, and because they had no reason to know whether "special circumstances" existed in this case until the later publication of the Bankruptcy Examiner's Report, they cannot be charged with inquiry notice until the report was published.  As noted above, however, it need only be probable – not certain – that a fraud has occurred for inquiry notice to attach.  Newman, 335 F.3d. 2d at 193.  That there was a small chance the rule was not violated, on the basis of an exception for "special circumstances," is insufficient to negate the gale winds and storm warnings.

Accordingly, since plaintiffs were on inquiry notice as of the publication of the 2000 annual report in April 2001, the restructuring reserve claim expired before the passage of the Sarbanes-Oxley Act and is thus barred by the then-applicable one-year statute of limitations.

### iii.  Failure to Issue Going Concern Qualification and Misrepresentations Regarding Refinancing

Defendants claim that plaintiffs were on inquiry notice no later than August 9, 2001 regarding both (i) KPMG's allegedly fraudulent failure to issue a going concern qualification on the 2000 annual report and the quarterly report for the first quarter of 2001; and (ii) individual defendants' alleged misrepresentations in the quarterly report for the first quarter of 2001 regarding Polaroid's ability to refinance.  There is, as defendants assert, a logical link between the succession of troubles experienced by Polaroid in the spring of 2001 and the alleged frauds.  Both the failure to issue a going concern qualification and the representation that Polaroid expected to be able to refinance are essentially statements (or omissions) about Polaroid's solvency; information that Polaroid was at that time – or was about to be – insolvent would suggest to investors that those representations were wrong.  Defendants catalog a variety of relevant information to this effect: successive quarterly losses, restructurings, increased competition from digital photography, defaults and waivers on its short-term credit agreements, downgrades of its investment ratings, missed interest payments, and speculation of impending bankruptcy, among other warnings.

In <u>Salomon</u>, where the alleged fraud consisted of an analyst's positive reports about the company's financial condition, Judge Lynch found that storms of bad financial

news issued concurrently with the analyst's reports provided inquiry notice to investors. There, the company's publicly reported financial difficulties included losses, layoffs, the failure to make a large interest payment and subsequent declaration of default, predictions of impending bankruptcy, and an eventual bankruptcy filing itself.  373 F. Supp. 2d at 245-46.  The court found that the publicized downfall related directly to the fraud and that investors were on inquiry notice at the latest by the time of the company's bankruptcy filing.  Id. at 245; see also Jackson National Life, 32 F.3d at 702-03 (where warning signs about a company's potential insolvency were contained within the very prospectus that plaintiffs claimed failed to disclose the going concern risk, plaintiffs were on notice).

Although this case is similar to Salomon and Jackson National Life in regard to the nexus between the alleged fraud and the publicly available information, several factors distinguish it.  First, unlike the fraud at issue in Salomon, which was being perpetrated for the most part concurrent with the alleged storm warnings, the August 9, 2001 going concern qualification was published months after KPMG's allegedly fraudulent failure to include a going concern qualification in the 2000 annual report and the first quarter 2001 quarterly report.  Similarly, the missed interest payment in July 2001 – which defendants argue provided inquiry notice of the alleged fraud with respect to Polaroid's statement that it expected to refinance – occurred two months after the first quarter 2001 quarterly report.  Even where a company's financial decline relates to the alleged fraud, courts have declined to find inquiry notice if that decline followed the fraud in time and was therefore susceptible to a more benign interpretation.  See Fogarazzo v. Lehman Bros., Inc., 341 F. Supp. 2d 274, 300 (S.D.N.Y. 2004) ("At worst,

RSL's ultimate decline . . . was merely evidence that [defendants'] reports were <u>wrong</u>, not that they were intentionally false."); <u>Boley</u>, 1990 U.S. Dist. LEXIS 9912, at *14 (financial problems "could have easily been attributed to economic conditions beyond the defendants' control").

Second, rather than involving an analyst who over-inflates his reviews as in <u>Salomon</u>, or the failure to declare that a company is currently bankrupt as in <u>Jackson National Life</u>, this litigation involves an auditor's allegedly fraudulent failure to declare that a there is a substantial doubt about the entity's ability to continue as a going concern. Because that decision is one of substantial complexity, KPMG's exercise of discretion in making that decision is far less likely to suggest fraud than were the clearly contrary-to-fact reports in <u>Salomon</u> and <u>Jackson National Life</u>.  Even considering the financial troubles that preceded the August 9, 2001 going concern qualification that therefore occurred concurrent with the alleged fraud,[4] it would be more than reasonable to attribute KPMG's decision to a judicious exercise of discretion and therefore not to deception.

Importantly, the U.S. Court of Appeals for the Second Circuit has stressed the caution with which courts must approach the inquiry notice question on a motion to dismiss.  <u>See</u> <u>Lentell</u>, 396 F.3d at 168 ("'Whether a plaintiff had sufficient facts to place it on inquiry notice is 'often inappropriate for resolution on a motion to dismiss'" (quoting <u>LC Capital</u>, 318 F.3d at 156 (quoting <u>Marks v. CDW Computer Ctrs.</u>, 122 F.3d 363, 367 (7th Cir. 1997)))).  Because of the sensitivity with which it must approach this

---

[4] Some of this information is available through news articles attached to the defendants' responses chronicling Polaroid's struggles.  The Court does not consider these in its determination.  Even were they to be considered, they add little to the realm of Polaroid knowledge that could not be gleaned from the company's own statements and are insufficient to alter the Court's analysis.  Moreover, the earliest news article defendants cite suggesting that Polaroid might be nearing chapter 11 was published in July 2001, months after the allegedly fraudulent financial statements and therefore consistent with the theory that Polaroid's fortunes had dramatically worsened in the intervening time.  <u>See</u> What's News: Business and Finance, Wall St. J., July 11, 2001, at A1.

close question, and because plaintiffs' claims regarding the going concern qualification and refinancing representation are more easily disposed of on scienter grounds, the Court proceeds to that inquiry in lieu of determining whether the allegedly fraudulent refinancing misrepresentations and failure to issue a going concern qualification prior to August 9, 2001 are barred by the statute of limitations.

### C. Scienter

Because plaintiffs' fraud allegations with respect to the deferred tax assets and the reversal of a restructuring reserve have been dismissed on statute of limitations grounds, the only remaining claims involve KPMG's failure to issue a going concern qualification earlier than it did and Polaroid executives' alleged misrepresentations regarding refinancing. These claims fail because plaintiffs have not adequately pled scienter.

Pursuant to the Private Securities Litigation Reform Act of 1995 and Fed. R. Civ. P. 9(b), a plaintiff must plead fraud with particularity. With respect to scienter, this requires the plaintiff to "state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind." 15 U.S.C. §78u-4(b)(2); In re JP Morgan Chase Secs. Litig., 363 F. Supp. 2d 595, 616 (S.D.N.Y. 2005). To survive a motion to dismiss, a complaint must plead a strong inference of scienter by alleging with particularity either (a) "facts to show that defendants had both motive and opportunity to commit fraud" or (b) "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001).

i.      KPMG

Plaintiffs have not sufficiently pled that KPMG had the "motive and opportunity" to fraudulently fail to issue a going concern qualification in connection with the 2000 annual report and the quarterly report for the first quarter of 2001.  A plaintiff can properly plead motive by pleading "concrete benefits that could be realized by one or more of the false statements" identified in the complaint.  Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994).  While KPMG might in some way benefit from helping keep Polaroid afloat, such as by retaining Polaroid's business, courts in this Circuit have repeatedly found that such generalized motives, being ubiquitous, are insufficient to establish scienter.  See Zucker v. Sasaki, 963 F. Supp. 301, 308 (S.D.N.Y. 1997) ("[The] mere receipt of compensation and the maintenance of a profitable professional business relationship for auditing services does not constitute a sufficient motive for purposes of pleading scienter."); Friedman v. Arizona World Nurseries Ltd. Partnership, 730 F. Supp. 521, 532 (S.D.N.Y. 1990).

Instead, plaintiffs rely on "circumstantial evidence of conscious misbehavior or recklessness."  For recklessness to satisfy the scienter requirement, a defendant's behavior must be "'highly unreasonable,' representing 'an extreme departure from the standards of ordinary care'."  Rothman v. Gregor, 220 F.3d 81, 90 (2d Cir. 2000) (quoting Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir. 1978) (internal quotation marks omitted)); see also SEC v. PriceWaterhouse, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992) (to establish recklessness, plaintiff must show that "the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts").  Recklessness can be established

22

by showing that defendants (1) benefited in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.  Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000).

Plaintiffs apparently rely on the latter two types of recklessness.  Specifically, they claim that KPMG's conduct was reckless because it was aware of a series of recent struggles experienced by Polaroid – for example, that digital photography competition was devastating its business, that short-term lenders "wanted to get out" (Compl. ¶ 76), and that Polaroid would be unable to further extend the waivers on its recent credit agreement defaults – but ignored those indicia of impending failure in favor of the unsubstantiated reports from the DKW bankers that Polaroid would be able to obtain the refinancing it needed to survive.  The bankruptcy examiner, as noted above, found that as of December 2000, there were "serious issues respecting Polaroid's ability to continue as a going concern" and that KPMG's reliance on DKW's assessment regarding refinancing prospects was insufficient – from the perspective of GAAS – to withhold issuing a going concern qualification. (Mandarino Report, at 61-62; SFAS No. 6)

This alleged conduct by KPMG does not create such a strong inference of recklessness as to meet the heightened pleading requirements for fraudulent intent, including recklessness.  See 15 U.S.C. § 78u-4(b)(1).  To meet that requirement, plaintiffs must state concrete facts that, if true, would enable a finding that KPMG's audit was such an "extreme departure from the standards of ordinary care" as to rise to the level of recklessness.  Rothman, 220 F.3d at 90; see also In re AOL Time Warner Sec. &

"ERISA" Litig., 381 F. Supp. 2d 192, 219 (S.D.N.Y. 2004).  Here, even if KPMG's decision to ignore the evidence referenced by plaintiffs, on its own, would have been reckless, by plaintiff's own admission, and the bankruptcy examiner's concurrence, the decision's reasonableness depended on whether Polaroid would be able to refinance its short term debt and thereby continue as a going concern.  As reflected in the Bankruptcy Examiner's Report upon which plaintiffs substantially rely, KPMG did investigate the refinancing issue: it held a phone conference with DKW regarding refinancing in March 2001; documented its own analysis in a "Corporate Recovery Memorandum"; and was very aware that whether Polaroid was able to continue as a going concern depended on the likelihood of obtaining refinancing.  (Mandarino Report, at 42-48.)  Because plaintiffs do no more than allege that this research was insufficient, the Amended Complaint suggests at most that KPMG was negligent, and certainly does not allege facts that rise to the level of malfeasance required for plaintiffs to plead recklessness with the requisite particularity.  The Court simply cannot say, based on the facts as set forth in the Amended Complaint and in the Bankruptcy Examiner's Report, that KPMG was substantially remiss in its duty to monitor information or that no reasonable accountant would have behaved as KPMG did.  Novaks, 216 F.3d at 311; PriceWaterhouse, 797 F. Supp. at 540.

As such, this case is unlike Arnlund v. Deloitte & Touche LLP, 199 F. Supp. 2d 461 (E.D. Va. 2002), which plaintiffs cite for the proposition that KPMG should not have relied on DKW's  assertions.  In Arnlund, auditors were alleged to have provided an unqualified opinion despite being aware of the company's severe liquidity problems; the district court found that the facts alleged could support a finding of recklessness on the

theory that the auditors performed no investigation into the liquidity crisis.  Id. at 480-81;
see also In re Complete Mgmt. Inc. Sec. Litig., 153 F. Supp. 2d 314, 334 (S.D.N.Y.
2001).  Here, as evidenced by the report upon which plaintiffs rely, there was an
investigation and analysis into whether Polaroid could overcome its impending liquidity
problems by refinancing.  That KPMG may have violated generally accepted auditing
standards by basing its going concern decision in part on DKW's representations may
establish a lack of thoroughness, but it does not, without more, demonstrate recklessness.
See Rothman, 220 F.3d at 98; Jacobs v. Coopers & Lybrand, L.L.P., No. 97-Civ.-3374,
1999 U.S. Dist. LEXIS 2102, at *40 (S.D.N.Y. Feb. 26, 1999) ("Plaintiffs more than just
allege that the [defendant] failed to adhere to GAAS in its audit . . . .  They put this
failure in a broader context with allegations that, taken together, paint a portrait of an
audit so reckless that a jury could infer intent to defraud.").[5]  Accordingly, plaintiffs'
fraud claims against KPMG relating to its failure to issue a going concern qualification
fail as a matter of law and must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) and 15
U.S.C. § 78u-4(b)(3)(A).

    *ii.    Polaroid Executives*

    Individual Polaroid executives cannot be liable for KPMG's failure to issue a
going concern qualification, since the going concern decision rests entirely within the
ambit of the auditor.[6]  However, plaintiffs also allege that the individual defendants

---

[5] Nor are the allegations at hand similar to those in In re Worldcom Inc. Sec. Litig., 352 F. Supp. 472
(S.D.N.Y. 2005), AUSA Life Ins. Co. v. Ernst and Young, 206 F.3d 202 (2d Cir. 2000), or Jacobs, No. 97-
Civ.-3374, 1999 U.S. Dist. LEXIS 2102.  Those cases involved auditors' alleged failures to investigate
their clients' accounting improprieties; here, KPMG is not alleged to have been complicit in its client's
nefarious behavior, but instead to have wrongly evaluated its client's prospects for survival.
[6] To the extent that plaintiffs attempt to implicate DiCamillo in the going concern decision because he had
served on a non-profit board with Stephen Butler, the chairman of KPMG, and because he placed a phone
call to Butler before KPMG signed off on the 2000 annual report, this is insufficient to plead scienter with

fraudulently represented in the quarterly report for the first quarter of 2001 that "[Polaroid] expects to complete the refinancing . . . in the second half of 2001."  Again, plaintiffs must establish with particularity that (i) Polaroid officials had the motive and opportunity to commit fraud; or (ii) strong circumstantial evidence suggests conscious misbehavior or recklessness by those officials.  Kalnit, 264 F.3d at 138

      As to motive and opportunity, plaintiffs contend that the individual defendants' motive was to ensure that Polaroid did not violate its debt covenants or enter bankruptcy, ultimately enabling them to retain their jobs.  Plaintiffs point out that Leuders is on record stating his concern about Polaroid's debt covenants, and that DiCamillo was sufficiently worried about the going concern qualification to phone the chairman of KPMG.  Plaintiffs and defendants cite conflicting case law regarding whether the desire to forestall loan defaults is sufficient to establish motive.  Compare Howard v. Everex Sys., Inc., 228 F.3d 1057, 1063-64 (9th Cir. 2000) (defendants motivated to commit fraud in order to prevent default on loan agreement), with In re Cross Media Mkting. Corp. Sec. Litig., 314 F. Supp. 2d 256, 264-65 (S.D.N.Y. 2004) ("[T]he alleged desire[] . . . to maintain compliance with the financial covenants of a company loan agreement . . . [is] similarly inadequate to support an allegation of intent to commit fraud.").  However, this issue is more appropriately relevant to the reserve reversal fraud, given allegations that that fraud was perpetrated at least in part in order to meet certain debt covenants.  It is not relevant to the alleged refinancing misrepresentations because lying about Polaroid's prospects for refinancing could not have affected Polaroid's ability to meet its debt covenants.

---

respect to DiCamillo.  The fact that the call itself occurred is not sufficient to establish with particularity foul play by DiCamillo.

The same is true to the extent plaintiffs more generally suggest that defendants' motive was to avoid bankruptcy and retain their jobs.  Defendants contend that the Second Circuit has held that the desire to remain employed is insufficient to establish motive in securities fraud cases.  <u>Novaks</u>, 216 F.3d at 307.  While <u>Novaks</u> does not involve the likelihood of imminent job loss and is therefore distinguishable, the Court need not decide this question because it finds that job loss is in any event an implausible motive in this case.  Leuders' and DiCamillo's job prospects were not and could not have been advanced by falsely representing that refinancing negotiations with prospective lenders were going well.  If Polaroid executives knew that the company would be unable to attract capital for refinancing, no amount of lying about that fact in its financial statement could alter it.

Finally, plaintiffs have not pled with the heightened particularity required facts suggesting conscious misbehavior or recklessness by Leuders or DiCamillo.  Plaintiffs contend that they have demonstrated that the defendants "had access to information that contradicted the representations they made to the investing public."  (Plaintiffs' Mem. in Opposition to Motion to Dismiss by Individual Defendants) ("Pl. Opp."), at 14.)  But plaintiffs have not alleged facts that would suggest that the individual defendants had reason to believe it would be disingenuous to state – as of the time of the publication of the quarterly report for the first quarter of 2001 – that the company expected to be able to refinance.

With regard to what the individual defendants knew or should have known, plaintiffs allege only that "as one of the two people at Polaroid managing the refinancing process, [Leuders] would necessarily have known that no due diligence had been

27

commenced by any potential lender, creating serious doubt as to whether Polaroid would be able to complete a refinancing."  (Pl. Opp. at 18.)  While plaintiffs make much of the fact that diligence had not yet been commenced, it is not clear why this fact alone made it disingenuous for Polaroid to report that it expected to be able to refinance.  Polaroid's short-term debt was not scheduled to mature until January 2002 (Mandarino Report, at 57), a date still nine months away at the time the allegedly fraudulent statement was made.

Moreover, the Bankruptcy Examiner's Report reflects that progress was in fact being made towards the refinancing goal in March and April of 2001, just before the publication of the relevant quarterly report on May 16.  Specifically, on March 16, 2001, DKW sent requests for proposals to lenders that included Citibank and Fleet.  (Mandarino Report, at 47.)  Certain of these lenders responded with proposals, which were subject to the lenders' due diligence.  (Id. at 48.)  They thereupon delivered presentation materials to Polaroid.  (Id.)  Citibank in particular set a target date of April 9, and apparently it or another lender commenced diligence in April.  (Id.)  The first quarter had by that point ended, and the quarterly report would be published the following month.  Plaintiffs have pointed to no facts suggesting that the progress being made by Polaroid by April 2001 had changed by the publication of the quarterly report, let alone that it was reckless given this state of affairs for Polaroid's officials to remain optimistic.  While a DKW document entitled "Polaroid Discussion Materials" – dated on the very day that the quarterly report for the first quarter of 2001 was published – recommended that Polaroid pursue chapter 11, there is no claim that the individual defendants were privy to that recommendation before the report was issued.  As such, plaintiffs have set forth facts that establish little

more than that, at best, the individual defendants were too optimistic about their company's prospects for survival. The Amended Complaint and Bankruptcy Examiner's Report thus do not set forth facts that create a strong inference that the individual defendants' conduct constituted such an extreme departure from standards of ordinary care, Rothman, 220 F.3d at 90, and the fraud claim insofar as it relates to the alleged refinancing misrepresentations must accordingly be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) and 15 U.S.C. § 78u-4(b)(3)(A).

## III.   CONCLUSION

As discussed above, defendant's motion to dismiss the Amended Consolidated Class Action Complaint is granted. Plaintiffs' claims with respect to the alleged deferred tax asset and restructuring reserve reversal frauds are dismissed as time-barred because plaintiffs were on inquiry notice more than one year before commencing this action; plaintiffs' claims with respect to the alleged going concern qualification and refinancing misrepresentation frauds are dismissed for failure to plead scienter with the requisite particularity.

Dated: New York, New York
       November 13, 2006

SO ORDERED:

Sidney H. Stein, U.S.D.J.